UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------- X

LARRY JEFFCOAT,

                Plaintiff,

   -against-

MICHAEL ASTRUE,
Commissioner of Social Security,

                Defendant.

--------------------------------------- X

NOT FOR PUBLICATION

**MEMORANDUM & ORDER**

09-CV-5276 (KAM)

**MATSUMOTO, United States District Judge:**

      Pursuant to 42 U.S.C. § 405(g), plaintiff Larry Jeffcoat ("plaintiff") seeks judicial review of the final decision of defendant Michael Astrue, Commissioner of Social Security (the "Commissioner"), denying plaintiff's application for Social Security Disability Insurance ("SSD") and Supplemental Security Income ("SSI") under Title II and XVI, respectively, of the Social Security Act ("the Act"). Proceeding *pro se*, plaintiff contends that he is entitled to receive SSD and SSI benefits due to severe medically determinable impairments, which he alleges render him disabled and prevent him from performing any work. Presently before the court is the Commissioner's motion for judgment on the pleadings. For the reasons set forth below, the Commissioner's motion is denied and the case is remanded for further proceedings consistent with this opinion.

**A. Procedural History**

Plaintiff applied for disability benefits on February 1, 2008, alleging disability beginning January 1, 2002.[1] (Tr. 89.) Plaintiff contended that he was disabled due to human immunodeficiency virus ("HIV"), hepatitis C,[2] headaches, blindness in the left eye, dizziness, and pain in the stomach, right knee and shoulders. (Tr. 89-95, 96-99, 116.) The Social Security Administration ("SSA") denied his application on May 20, 2008. (Tr. 44-49.)

After his claim was denied, plaintiff requested a hearing (Tr. 50-51), and appeared with an attorney before Administrative Law Judge Leonard E. Yoswein (the "ALJ") on April 20, 2009. (Tr. 20-36.) On June 26, 2009, the ALJ considered the case and issued a decision denying plaintiff's application, finding that, based on the entire record, including plaintiff's medical records, plaintiff did not have an impairment or combination of impairments that was "severe" according to the

---

[1]     Because plaintiff's earnings record showed that plaintiff had acquired sufficient quarters of coverage to remain insured through September 1, 2005, plaintiff was required to show disability on or before that date in order to be entitled to SSD. (Tr. 10.)

[2]     "Hepatitis C is . . . caused by exposure to hepatitis C virus, the most common type seen after transfusions or injected drug abuse. It is spread in various ways; although some infected persons have no known risk factors except sexual relations with an infected person, . . . sexual transmission is rare." *Dorland's Medical Dictionary* (Elsevier 2007) *available at* http://www.mercksource.com/pp/us/cns/cns_hl_dorlands_split.jsp?pg=/ppdocs/us/common/dorlands/dorland/nine/10001251.htm (last visited August 6, 2010) ("*Dorland's*").

regulations.  (Tr. 7-19); *see also* 20 C.F.R. § 416.945(a); 20

C.F.R. § 416.920(c) ("If you do not have any impairment or

combination of impairments which significantly limits your

physical or mental ability to do basic work activities, we will

find that you do not have a severe impairment and are, therefore,

not disabled.").  The ALJ also found that plaintiff had the

residual functional capacity ("RFC") to perform a full range of

work at all exertional levels, including past relevant work as a

construction laborer, an adult caretaker, and a cook's helper.

(Tr. 7-19.)

    The Appeals Council denied plaintiff's request for

review on October 21, 2009 and, as a result, the ALJ's decision

became the final decision of the Commissioner.  (Tr. 1-3.)  This

appeal followed.

    On November 30, 2009, plaintiff commenced this action

against the Commissioner, claiming that he was disabled beginning

January 1, 2002, due to HIV, left-eye blindness, and arthritis of

his left shoulder, right knee, and right leg.  (Doc. No. 1,

Compl. ¶ 4; *see* Tr. 29.)  The Commissioner answered on March 1,

2010 and moved for judgment on the pleadings on April 29, 2010.

(Doc. No. 8, Ans.; Doc. No. 10, Mot. for J. on the Pleadings

("Mot.").)  Plaintiff opposed the motion.  (Doc. No. 13, Response

in Opp.)

**B. Non-Medical Facts in the Administrative Record**

1. *Background*

          Plaintiff was born on December 24, 1959, and was forty-nine years old when the ALJ rendered his decision.  (Tr. 26, 89, 96, 111.)  Plaintiff lives alone in a first-floor apartment in Brooklyn.  (Tr. 90.)  He is a religious Baptist and practices his faith regularly.  (Tr. 251.)  Plaintiff stopped attending high school in the beginning of the eleventh grade due to what he claimed were negative influences from peers.  (Tr. 250.)

2. *Criminal History*

          Plaintiff's criminal history includes two arrests and one conviction for assault, for which he was sentenced to eight months in a Florida prison.  (Tr. 250.)  Both drugs and alcohol were involved in this incident.  (*Id.*)  The record contains no additional information about plaintiff's criminal history.

3. *Employment History*

     A. Prior to Alleged Onset Date

          According to his disability report, from 1989 to 1990,[3] plaintiff was employed by the Walt Disney Company as a part-time cook, cooking and cleaning for seven hours a day, three days a week.  (Tr. 117.)  This job required walking and standing for seven hours of an eight-hour workday, mopping and sweeping the

_____

[3]     Notably, plaintiff's work history report indicates that plaintiff worked for Walt Disney from 1993 to 1994.  (Tr. 143.)

floors, and sitting for the remaining hour. (Tr. 144.)
Plaintiff frequently lifted around twenty-five pounds, although
he occasionally lifted up to fifty pounds. (*Id.*)

Plaintiff's disability report shows that, at the same
time that he was working as a part-time cook, plaintiff also
worked in construction and roofing for different companies from
1987 until January 1, 2002. (Tr. 117.) Plaintiff's work history
report indicates that he held two different construction jobs,
with a seven-year gap in between. (Tr. 143.) He reported
working in "roofing" from 1990 to 1992 and in "paint and sheet
rock" from 1999 to 2002. (Tr. 143.) In these positions, on
average, he worked five days a week for ten hours a day and used
machines, tools, and equipment as well as technical knowledge and
skills. (Tr. 145-46.) He lifted and carried materials everyday
for about fifty to sixty feet that frequently weighed up to
thirty pounds and occasionally weighed as much as 100 pounds or
more. (*Id.*) In his position with a roofing company, plaintiff
replaced damaged roofs, which involved walking and standing for
seven hours of an eight-hour workday and frequently lifting
twenty-five pounds. (Tr. 145.) The heaviest weight that he
reported lifting was around 100 pounds. (*Id.*) In his job in
"painting and sheet rock," plaintiff primarily tore down and
replaced sheet rock and installed doors and windows, which
entailed walking or standing for eight hours of an eight-to-nine-

hour workday. (Tr. 146.) He frequently lifted twenty-five pounds; the heaviest weight that he lifted was fifty pounds. (*Id.*)

B. Subsequent to Plaintiff's Alleged Onset Date

Plaintiff claims disability from January 1, 2002, the same date that he ended his work in construction.[4] (Tr. 89, 117.) According to plaintiff's Work History Report, plaintiff did not work for a five-year period between 2002 and 2007. (Tr. 143.) Beginning in either November of 2006 or 2007 and lasting until either January of 2007 or 2008,[5] plaintiff worked as an adult caretaker at Elder Choice Hudson Valley. (Tr. 27, 117, 143.) As a caretaker, plaintiff worked twelve hours per day, five days a week. (Tr. 147.) He walked, stood, or sat up to seven or eight hours per workday. (*Id.*) Plaintiff lifted less than ten pounds during the duration of the position, as his duties entailed cooking and carrying food and water. (*Id.*)

4. *Plaintiff's Hearing Testimony and Self-Reported Condition*

At the administrative hearing held on April 20, 2009, plaintiff testified that he stopped working as a caretaker

---

[4]    In a psychosocial assessment taken of plaintiff at Project Samaritan, plaintiff reported that he left his last job in roofing and painting because business had slowed and he had no new assignments. (Tr. 251.)

[5]    Plaintiff's reports on the dates that he worked as a caretaker are inconsistent. Plaintiff's undated disability report indicates that he performed this job from November 23, 2007 to the "present." (Tr. 117.) However, plaintiff testified at the hearing held on April 20, 2009 that he worked as a caretaker for about three or four months until January 2007 and January 2008. (Tr. 27.)

because of headaches and pain in his left shoulder and right knee and leg. (Tr. 29, 30.) He testified that his primary problem was shoulder pain, which often penetrated through his arm into his fingers, causing numbness in his fingertips. (*Id.*) He reported using Ibuprofen and Bengay for pain. (Tr. 31.) Plaintiff also stated at the hearing that he had eyesight in only one eye, which blurred his overall vision. (*Id.*) He reported that Combivir,[6] the medication that he took for HIV, made him dizzy and sleepy. (Tr. 29, 30, 33.) Plaintiff also reported suffering from Hepatitis C, but provided no information about whether this disease impacted his daily life. (Tr. 30.) He named Dr. Arturo Caesar as his treating physician.[7] (Tr. 31-32.)

In a questionnaire dated February 16, 2008, plaintiff reported that, on a typical day at that time, he walked outside for a short period, traveled by public transportation,[8] read or watched television until his eye bothered him, listened to gospel music, and tried to do push-ups. (Tr. 35, 123, 124, 126, 127.) However, plaintiff claimed that he could only walk for three or four blocks before needing to rest for ten to fifteen minutes. (Tr. 129.)

---

[6]    "Combivir is a combination preparation of the nucleoside analogueszidovudine and lamivudine, used in treatment of HIV infection and AIDS." *Dorland's*.

[7]    The ALJ refers to plaintiff's treating physician as Dr. Caesar Arturo throughout the opinion.

[8]    Plaintiff does not drive because of his blindness in one eye; he also does not have a driver's license. (Tr. 126.)

Plaintiff also reported that he often prepared meals consisting of rice, grits, beans, and greens, and performed light housework, such as sweeping the floor of his apartment, making his bed, and washing and ironing his clothing. (Tr. 15, 124, 125, 126.) He went shopping once a week, which took him slightly more than one hour. (Tr. 127.) Although he is able to clean his apartment, do laundry, and dress and bathe himself, plaintiff claims that his medical conditions have increased the amount of time that it takes him to complete these tasks. (Tr. 34, 35, 124, 126.) He claimed that he was previously able to lift, kneel, and stand continuously, but has been unable to perform any of these tasks since the onset of his illnesses. (Tr. 124.) He stated that headaches and pain in his shoulder, arm, and knee affect his sleep and his ability to do yard work. (Tr. 124, 126.) He also reported that he has difficulty "remembering things" because of headaches. (Tr. 130.)

## C. Medical Facts in the Administrative Record

1. *Evidence in the Record Prior to Project Samaritan*

Although plaintiff claims disability from January 1, 2002, the earliest medical records contained in the administrative record are from March 4, 2005.[9] (Tr. 191.) On this date, Dr. Chaitali Bagchi took x-rays of plaintiff's chest,

---

[9]     Plaintiff's attorney admitted at the administrative hearing that medical records prior to March 4, 2005 did not exist. (Tr. 24.)

which revealed no active infiltrates[10] or significant pulmonary venous congestion.[11] (*Id.*) Dr. Bagchi no longer perceived an increased density in the right mid-lung, which had been noted after prior chest radiographs in January 10, 2005. (*Id.*)

On April 28, 2006, because of plaintiff's cough and HIV-positive status,[12] Dr. Smiljan Puljic took an x-ray of plaintiff's chest, which was negative. (Tr. 192.) Plaintiff's heart was not enlarged and his mediastinal[13] structures appeared normal. (*Id.*)

2. *Project Samaritan*

Plaintiff first reported to Project Samaritan on May 6, 2006, after being referred by the Adult Day Health Center ("ADHC") in Brooklyn. (Tr. 156-61.) Plaintiff's chief complaint was left shoulder pain since February of that year. (Tr. 156.) He also reported a 2005 HIV diagnosis, for which he had been taking Combivir and Sustiva[14] for one year. (*Id.*) He stated

---

[10] Infiltrates are materials "that penetrate the interstices of a tissue or substance." *Dorland's*.

[11] Pulmonary venous congestion refers to "shortness of breath that results from fluid seeping into the air spaces of the lungs," causing heart failure. Merck & Co., *Merck Manual of Diagnosis and Therapy* (2008) *available at* http://www.mercksource.com/pp/us/cns/cns_merckmanual_frameset.jspzQzpgzEzhttpz CzzSzzSzwwwzPzmerckzPzcomzSzmmhezSzsec03zSzch021zSzch021bzPzhtml (last visited August 6, 2010) ("Merck Manual").

[12] The Administrative Record does not reflect the exact date or place in which plaintiff initially received his HIV diagnosis.

[13] "Mediastinum is the mass of tissues and organs separating the sternum in front from the vertebral column behind, containing the heart and its large vessels, trachea, esophagus, thymus, lymph nodes, and other structures and tissues. It is divided into anterior, middle, posterior, and superior regions." *Dorland's*.

[14] Sustiva is a prescription drug of the generic efavirenz. "Efavirenz is

that he had difficulties with his appetite, sleep, vision, and bowel habits. (Tr. 158-59.) In addition, he had an undated left eye injury. (Tr. 157.) Plaintiff reported abstaining from alcohol and crack cocaine for the month leading up to his appointment. (Tr. 158.) He denied any mental health impairments. (*Id.*)

Project Samaritan conducted an initial examination of plaintiff, who met one defining condition of Acquired Immune Deficiency Syndrome ("AIDS"), which was a CD4 count of less than 200.[15] (Tr. 156.) Also, plaintiff's parotid gland[16] was enlarged, his tongue was inflamed, and he had a heart murmur.[17] (Tr. 160.) In the assessment, the doctor noted that blood tests in February 2006 showed that plaintiff's CD4 count was 197 and

---

a non-nucleoside reverse transcriptase inhibitor, used as an antiretroviral in treatment of human immunodeficiency virus infection." *Dorland's.*

[15]     "The number of CD4$^+$ lymphocytes in blood (the CD4 count) helps determine how well the immune system can protect the body from infections and how severe the damage done by HIV is. Healthy people have a CD4 count of about 800 to 1,300 cells per microliter of blood. Typically, [forty] to [sixty percent] of CD4$^+$ lymphocytes are destroyed in the first few months of infection. After about [three] to [six] months, the CD4 count stops falling so quickly, but without treatment, it usually continues to decline at rates that vary from slow to rapid. If the CD4 count falls below about 200 cells per microliter of blood, the immune system becomes less able to fight certain infections." *Merck Manual.*

[16]     The parotid gland is "either of a pair of glands, the largest of the salivary glands, located on either side of the face just below and in front of the ears." *Dorland's.*

[17]     A heart murmur is "any sound in the heart region other than normal heart sounds; common causes include movement of blood through narrowed or stenotic heart valves and blood leaking through a valve that does not close properly. In many cases a murmur may be of the *innocent* or *functional* type, with no heart disease at all, so that it causes no trouble; this type is only sporadically present and in time may go away completely." *Dorland's.*

his viral load was less than fifty.[18]  (Tr. 161.)  The doctor

diagnosed plaintiff with AIDS, Hepatitis C, left shoulder pain, a

heart murmur, tongue inflammation, and bilateral parotid

enlargement.  (*Id.*)  He recommended that plaintiff continue

taking Combivir and Sustiva for AIDS and add Bactrim[19] to his

regimen for pneumocystis carinii pneumonia ("PCP")[20]

prophylaxis.[21]  (*Id.*)

On May 16, 2006, Project Samaritan performed

occupational and physical therapy evaluations for plaintiff's

left shoulder pain.  (Tr. 223-24, 228-29, repeated at Tr. 230-

31.)  At the occupational therapy evaluation, plaintiff asserted

that his shoulder pain interfered with his sleeping and became

aggravated when he sat for prolonged periods of time.  (Tr. 223.)

Examination revealed that plaintiff's motor strength was four out

of a possible five, where five represents full motor strength, in

---

[18]     The "amount of HIV virus in the blood (specifically the number of copies
of HIV RNA) is called the viral load.  Viral load represents how quickly HIV
is replicating.  When people are first infected, the viral load increases
rapidly.  Then, even without treatment, it drops to a lower level, which
remains fairly constant, called the set point.  This level varies widely from
person to person.  Viral load also indicates how contagious the infection is
and how fast the infection is likely to worsen.  During successful treatment,
the viral load decreases to a very low or undetectable level.  However,
inactive (latent) HIV is still present within cells and if treatment is
stopped, it will start replicating." *Merck Manual.*

[19]     Bactrim is a "trademark for combination preparations of trimethoprim and
sulfamethoxazole," an antimicrobial.  *Dorland's.*

[20]     Pneumocystis carinii pneumonia is the former name for pneumocystis
pneumonia, which is "pneumonia caused by the yeastlike fungus *Pneumocystis
jiroveci,* occurring in premature infants and immunocompromised persons.  It is
characterized by dyspnea, tachypnea, fever, cough, and cyanosis.  If untreated
it leads to pulmonary consolidation, hypoxemia, and death." *Dorland's.*

[21]     Prophylaxis is a preventative treatment.  *Dorland's.*

the left shoulder and in the left side of his head and neck, but five elsewhere. (*Id.*) Plaintiff had a normal range of motion in all tested joints. (*Id.*) The therapist suggested occupational therapy to reduce pain and yoga to increase flexibility. (Tr. 224-25.) Following this recommendation, plaintiff attended eight occupational therapy sessions and was discharged from treatment on July 14, after having made "significant progress." (Tr. 226, *see* Tr. 227.)

The physical therapy evaluation revealed a normal range of motion and full motor strength of all joints. (Tr. 228.) Plaintiff walked with a normal gait pattern and no gait deviations. (*Id.*) The physical therapist indicated that "[p]atient is not a candidate for Physical Therapy at this time."[22] (Tr. 229.)

A chest x-ray, taken on the same date, showed no active pulmonary[23] disease. (Tr. 188, repeated at Tr. 190.) The heart appeared normal in size and contour. (*Id.*)

On May 23, 2006, Project Samaritan conducted a psychosocial assessment of plaintiff. (Tr. 244-51.) Although plaintiff reported a history of drinking beer and using crack, he stated that he wanted to "get [his] life in order" and "stop

---

[22]    Project Samaritan later recommended physical therapy to plaintiff on November 16, 2006, and plaintiff attended five sessions in December 2006.

[23]    Pulmonary is "relating to the lungs, to the pulmonary artery, or to the aperture leading from the right ventricle into the pulmonary artery." *Stedman's* at 342040.

[his] addiction." (Tr. 244-45.) While he was "shocked" by his AIDS diagnosis, he reported that he "knew he had to live with it" and was "coping well." (Tr. 246.) Plaintiff stated that he had complied with his medication regimen and denied any psychiatric or emotional problems in the past. (Tr. 246.) He stated that he experienced head trauma once as a result of involvement in a fight. (Tr. 249.) The assessment also indicates that plaintiff reported leaving his last job in roofing and painting because business had slowed and he had no new assignments. (Tr. 251.)

On June 1, 2006, Project Samaritan performed plaintiff's monthly medical assessment. (Tr. 162.) Plaintiff reported a facial rash and examination revealed hyper-pigmented pitting[24] and blotches. (*Id.*) His left eye injury was determined to be a cataract.[25] (*Id.*) Plaintiff's tongue inflammation had resolved and his bilateral parotid enlargement was stable. (Tr. 163.) It was noted that blood testing on May 12, 2006 was reactive for the Hepatitis C antibody (Tr. 182, 201), and revealed a CD4 count of 226 and viral load of less than seventy-five. (Tr. 163, 183, 201-02.) As a result, plaintiff's AIDS was deemed stable. (Tr. 163.)

Plaintiff continued to be examined monthly at Project

---

[24] Pitting is "the formation, usually by scarring, of a small depression." *Dorland's.*

[25] A cataract is "a clouding of the lens in the eye. The normally clear lens lets light enter the eye. As it becomes cloudy, less light enters and vision becomes blurry." *Dorland's.*

Samaritan through February 13, 2007, and his medical conditions remained stable, except for a heart murmur, which was noted on August 25, 2006. (Tr. 164-81; *see* Tr. 182-187.) On September 21 and October 20, plaintiff's eye cataract was in progress for prosthesis.[26] (Tr. 171, 173.) By November 16, the artificial eye was in place. (Tr. 175.) Beginning September 21, plaintiff complained of knee pain from an old injury, for which pain medication and a kneepad were prescribed. (Tr. 171.) The examining doctor consistently described plaintiff's AIDS as "stable." (Tr. 163-81.) Blood testing on August 11 revealed a CD4 count of 271 (Tr. 169), and blood testing on November 17, 2006 revealed a CD4 count of 276. (Tr. 177.) Viral loads on both occasions were deemed "undetectable" (Tr. 181), as they were less than seventy-five. (Tr. 169, 177, 183, 206, 214.) A September 22, 2006 blood test determined that plaintiff's hepatitis viral load was less than 615 (Tr. 182, 212), which was deemed undetectable. (Tr. 171, 173, 175, 177, 179, 181.)

On November 16, 2006, Project Samaritan conducted another physical therapy evaluation for plaintiff's right knee pain. (Tr. 232-33.) He walked with a normal gait pattern with no deviations. (Tr. 232.) He had normal range of motion and full muscle strength. (*Id.*) Balance was normal and sensation

---

[26]     Prosthesis is "an artificial substitute for a missing part, such as an eye, limb, or tooth, used for functional or cosmetic reasons, or both." *Dorland's*.

was intact.  (Tr. 233.)  His pain status was seven on a ten-point scale.  (*Id.*)  The therapist recommended physical therapy sessions two times a week for four to six weeks, and plaintiff attended five sessions in December 2006.  (Tr. 233, 236-37.)

During his monthly assessment on February 13, 2007, plaintiff reported cold symptoms, which Project Samaritan diagnosed as allergies.  (Tr. 180-81.)  While plaintiff complained of continuing pain in his right knee, Project Samaritan noted plans to discharge plaintiff from its primary care program as his AIDS had remained stable.  (*Id.*)  Plaintiff was advised to follow-up with his previous doctor and with ADHC. (Tr. 181.)

3. *Dr. Jamshid Sheikh*

At the request of the SSA, Dr. Jamshid Sheikh conducted an "Internal Medicine Examination" of plaintiff on March 19, 2008.  (Tr. 15, 257-61.)  Plaintiff complained of right knee pain present for ten years and right shoulder pain that "has been bothering him" for three to four years.  (Tr. 257.)  He described both pains as aches and explained that he took Ibuprofen to ease them and wore a neoprene brace at all times for his knee pain. (*Id.*)  Plaintiff stated that he was diagnosed as HIV positive in 2004[27] and complained of dizziness from his HIV medications, but had no other day-to-day issues related to HIV.  (*Id.*)  Lastly,

_____

[27]     The court notes that during his first visit at Project Samaritan,

plaintiff reported that he had been blind in the left eye for about fifteen years from an assault and stated that he had poor peripheral vision as a result. (*Id.*) He had headaches, which he believed were related to his left-eye blindness. (*Id.*)

Plaintiff related that he last worked two months earlier "doing elderly care." (*Id.*) In his home life, plaintiff stated that he cooked three to four times a week, cleaned four times a week, did laundry once a week, and shopped once or twice a week. (Tr. 258.)

Dr. Sheikh examined plaintiff and found that, although plaintiff was blind in his left eye, he had 20/40 visual acuity in his right eye and when using both eyes together. (Tr. 258.) Dr. Sheikh further found that plaintiff had a normal gait and stance, that he could squat fully, and that he had full motor strength in the upper and lower extremities. (Tr. 258-59.) An x-ray of plaintiff's right knee appeared normal. (Tr. 260, 262.) Plaintiff used no assistive devices and needed no help changing for the examination or getting on and off the examination table. (Tr. 258-59.) Dr. Sheikh found that, other than plaintiff's left eye, plaintiff's body parts, joints, and organs appeared normal. (Tr. 259.)

Dr. Sheikh diagnosed plaintiff with right knee pain, right shoulder pain, HIV, and left-eye blindness. (Tr. 260.) He

---

plaintiff reported receiving an HIV diagnosis in 2005. (Tr. 156.)

stated that plaintiff "appears to have mild limitations in regard
to performing activities which require high visual acuity due to
his left-eye blindness.  No other physical limitations are seen
on the exam."  (Tr. 260.)

4. *Dr. Peter Berg*

Dr. Peter Berg, an ophthalmologist, conducted an
examination of plaintiff's visual acuity on May 9, 2008, at the
request of the SSA.  (Tr. 265-66.)  Examination of plaintiff's
left eye revealed no light perception; the cornea was opaque.
(Tr. 265.)  Plaintiff complained that his right eye "waters."
(*Id.*)  Nevertheless, examination of the right eye revealed 20/20-
visual acuity without correction.  (*Id.*)  Plaintiff's right pupil
reacted to light normally, his extra-ocular motions[28] were full,
and his iris and lens were clear.  (Tr. 16, 265-66.)  Dr. Berg
concluded that "[o]n a functional basis[,] with both eyes taken
together[,] the patient has essentially normal visual acuity and
full visual fields."  (Tr. 266.)  Dr. Berg recommended that
plaintiff use protective eye wear when engaging in activities
that could cause right eye damage.  (*Id.*)

5. *Dr. A. Shteyngart*

The record contains a "Physical Residual Functional
Capacity Assessment" completed by Dr. Shteyngart, a disability

---

[28]     "Extraocular muscles are the six voluntary muscles that move the
eyeball: superior, inferior, middle, and lateral recti, and superior and
inferior oblique muscles."  *Dorland's*.

examiner. (Tr. 268-73.) However, the ALJ does not acknowledge Dr. Shteyngart's assessment or consider his opinion in the disability determination. (*See* Tr. 7-19.)

In the "Physical Residual Functional Capacity Assessment," Dr. Shteyngart opined that plaintiff could lift and carry up to ten pounds frequently and twenty pounds occasionally. (Tr. 269.) He stated that plaintiff could stand, walk, and sit, with normal breaks, for a total of about six hours in an eight-hour workday. (*Id.*) He reported that plaintiff's ability to push and pull, including the operation of hand or foot controls, was limited in his upper and lower extremities. (*Id.*) Dr. Shteyngart attributed these limitations to plaintiff's HIV-positive status, arthritis, and left-eye blindness. (*Id.*)

Further, Dr. Shteyngart opined that plaintiff had postural limitations, as he could only occasionally climb a ramp or stairs, balance, stoop, kneel, crouch, and crawl. (Tr. 269-70.) However, Dr. Shteyngart reported no manipulative, visual, communicative, or environmental limitations. (Tr. 270-71.) He found plaintiff's statements alleging "weakness and tiredness" and an "inability to stand/walk for a long period of time as a result of these symptoms" to be "partially credible" and attributed them to his HIV, arthritis, and blindness in the left eye. (Tr. 271-72.) Nevertheless, he stated that plaintiff's examinations resulted in "near normal findings." (Tr. 271.)

6. *Dr. Arturo Caesar*

On February 6, 2009, Dr. Caesar, an internist who indicated that he had a four-year treatment relationship with plaintiff, completed a "Medical Request for Home Care" form, based on his examination of plaintiff on January 30, 2009. (Tr. 16, 275-78.) He stated that plaintiff had three chronic conditions. (Tr. 275.) AIDS was the primary diagnosis with an onset date of April 25, 2005. (*Id.*) At that time, plaintiff's viral load was undetectable and his CD4 count was 424. (*Id.*) Plaintiff's secondary condition was blindness in the left eye. (*Id.*) Third, Dr. Caesar identified back pain and arthritis. (*Id.*) Dr. Caesar reported that plaintiff used Sustiva and Combivir, and noted that these were oral medications that plaintiff self-administered. (*Id.*) He also reported that plaintiff had a partial sensory impairment with respect to his sight, but exhibited no symptoms indicative of a mental impairment and was always alert. (Tr. 276.) Dr. Caesar did not prescribe any medical treatments or personal care services listed on the Home Care form. (Tr. 276-77.) Dr. Caesar opined that plaintiff had the ability to ambulate inside and outside, rise from a seated position, and get up from bed. (Tr. 277.)

Dr. Caesar also completed a "Medical Source Statement of Ability To Do Work-Related Activities (Physical)" on April 24, 2009. (Tr. 279-85.) Dr. Caesar opined that plaintiff could lift

and carry up to ten pounds frequently and between eleven and twenty pounds occasionally, but never over twenty pounds. (Tr. 279.) He stated that plaintiff could sit, stand, and walk for up to three hours each, uninterrupted, in an eight-hour workday. (Tr. 280.) He reported that plaintiff could reach, handle, finger, feel, and push or pull one-third of the time with his right hand, which is his dominant hand, and over two-thirds of the time with his left hand. (Tr. 281.) Dr. Caesar attributed these limitations to pain in plaintiff's right shoulder. (*Id.*) He noted that, previously, plaintiff was able to lessen pain in his left shoulder, which therapists had identified as degenerative joint disease ("DJD"),[29] through physical therapy. (*Id.*) Dr. Caesar further found that plaintiff could continuously use both feet for operation of foot controls. (*Id.*)

Although Dr. Caesar stated that plaintiff could climb, stoop, kneel, crouch, and crawl up to one-third of the time and balance continuously, he indicated that plaintiff had pain in his right knee. (Tr. 282.) He opined that plaintiff should never be around unprotected heights, move mechanical parts, or operate a motor vehicle. (Tr. 283.) However, he assessed that plaintiff could occasionally be exposed to humidity, wetness, dust, odors, fumes, pulmonary irritants, extreme cold, extreme heat, and

---

[29]     Degenerative joint disease is "arthritis characterized by erosion of articular cartilage, either primary or secondary to trauma or other conditions." *Stedman's* at 288490.

vibrations.  (*Id.*)  Dr. Caesar also stated that plaintiff could be exposed to a moderate noise level, such as that of an office, but not of heavy traffic or a jackhammer.  (*Id.*)

Dr. Caesar found that plaintiff could perform activities such as shopping, traveling without assistance, walking a block at a reasonable pace, using public transportation, climbing a few steps at a reasonable pace using a handrail, preparing meals, feeding himself, caring for personal hygiene, and sorting files.  (Tr. 284.)

<u>**DISCUSSION**</u>

**A. Standard of Review**

1. *The Substantial Evidence Standard*

"A district court may set aside the [ALJ's] determination that a claimant is not disabled only if the factual findings are not supported by 'substantial evidence' or if the decision is based on legal error."  *Burgess v. Astrue*, 537 F.3d 117, 127 (2d Cir. 2008) (internal citations omitted). "Substantial evidence" is "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Halloran v. Barnhart*, 362 F.3d 28, 31 (2d Cir. 2004) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)) (internal quotation marks omitted).  An evaluation of the "substantiality of evidence must also include that which detracts from its weight."  *Williams ex rel. Williams*

*v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988).

Accordingly, if there is substantial evidence in the record to support the Commissioner's factual findings, those findings are conclusive and must be upheld. *See Tejada v. Apfel*, 167 F.3d 770, 773-74 (2d Cir. 1999); *see also* 42 U.S.C. § 405(g). Moreover, the reviewing court "may not substitute its own judgment for that of the [ALJ], even if it might justifiably have reached a different result upon a *de novo* review." *Jones v. Sullivan*, 949 F.2d 57, 59 (2d Cir. 1991) (quoting *Valente v. Sec'y of Health and Human Servs.*, 733 F.2d 1037, 1041 (2d Cir. 1984)) (internal quotation marks omitted).

2. *The ALJ's Affirmative Duty to Develop the Record*

Notwithstanding the substantial deference afforded to the ALJ's determination, remand is appropriate where there are gaps in the administrative record or where the ALJ has applied an improper legal standard. *See Rosa v. Callahan*, 168 F.3d 72, 82-83 (2d Cir. 1999). "Because a hearing on disability benefits is a non-adversarial proceeding, the ALJ generally has an affirmative obligation to develop the administrative record." *Burgess*, 537 F.3d at 128; *see Lamay v. Comm'r of Soc. Sec.*, 562 F.3d 503, 508-09 (2d Cir. 2009) ("[S]ocial security hearings are not (or at least are not meant to be) adversarial in nature.").

Remand may be required where the ALJ fails to discharge his or her affirmative obligation to develop the record when

making a disability determination. *See Butts v. Barnhart*, 388
F.3d 377, 385-86 (2d Cir. 2009); *Pratts v. Chater*, 94 F.3d 34, 37
(2d Cir. 1996); *Echevarria v. Sec'y of Health & Human Servs.*, 685
F.2d 751, 755 (2d Cir. 1982) (holding that courts must first
ensure that claimant is afforded a full and fair hearing and a
fully-developed record before deciding whether the Commissioner's
findings are supported by substantial evidence).  The ALJ bears
this duty whether or not a claimant appears with representation.
*See Batista v. Barnhart*, 326 F. Supp. 2d 345, 353 (E.D.N.Y. 2004)
("Although an ALJ's obligation to develop the record is
heightened where the claimant appears *pro se,* the duty still
exists even where the claimant is represented by counsel or a
paralegal.") (internal citations omitted).

3. *The Commissioner's Five-Step Analysis of Disability Claims*

        A claimant is disabled within the meaning of the Act if
he has an "inability to engage in any substantial gainful
activity [('SGA')] by reason of any medically determinable
physical or mental impairment which can be expected to result in
death or which has lasted or can be expected to last for a
continuous period of not less than [twelve] months."  42 U.S.C.
§ 423(d)(1)(A).  The impairment must be of "such severity that he
is not only unable to do [his] previous work but cannot,
considering his age, education, and work experience, engage in
any other kind of substantial gainful work which exists in the

national economy." 42 U.S.C. § 423(d)(2)(A).

The SSA has promulgated a five-step sequential analysis that requires the ALJ to make a finding of disability if he or she determines: "(1) that the claimant is not working,[30] (2) that he has a 'severe impairment,'[31] (3) that the impairment is not one [listed in Appendix 1 of the regulations] that conclusively requires a determination of disability,[32] . . . (4) that the claimant is not capable of continuing in his prior type of work,[33] . . . [and] (5) there is not another type of work the claimant can do."[34] *Burgess*, 537 F.3d at 120 (internal citations omitted); *see also* 20 C.F.R. § 404.1520(a)(4).

The claimant must prove his case at steps one through four; accordingly, he bears the "general burden of proving . . . disability." *Burgess*, 537 F.3d at 128. At the fifth step, the burden shifts from the claimant to the Commissioner, requiring

---

[30]    Under the first step, if the claimant is currently engaged in "substantial gainful employment," the claimant is not disabled, regardless of the medical findings. 20 C.F.R. §§ 404.1520(a)(4)(i), 404.1520(b).

[31]    Under the second step, the claimant must have "any impairment or combination of impairments which significantly limits [his or her] physical or mental ability to do basic work activities" in order to have a severe impairment. 20 C.F.R. § 404.1520(c).

[32]    Under the third step, if the claimant has an impairment which meets the duration requirement and is listed in Appendix 1 or is equal to a listed impairment, the claimant is *per se* disabled. 20 C.F.R. § 404.1520(d).

[33]    Under the fourth step, the claimant is not disabled if he or she can still do his or her "past relevant work." 20 C.F.R. § 404.1520(a)(4)(iv).

[34]    Under the fifth step, the claimant may still be considered "not disabled" if he or she "can make an adjustment to other work" available in the national economy. *See* 20 C.F.R. § 404.1520(a)(4)(v).

the Commissioner to show that, in light of the claimant's RFC,[35] age, education, and work experience, he is "able to engage in gainful employment within the national economy." *Sobolewski v. Apfel*, 985 F. Supp. 300, 310 (E.D.N.Y. 1997). However, in making that determination, the Commissioner need not provide additional evidence about the claimant's RFC, but may rely on the same assessment that was applied in step four's determination of whether the claimant can perform his past relevant work. *See Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009); *see also* 20 C.F.R. § 404.1560(c)(2).

## B. The ALJ's Disability Determination

Applying the five-step sequential process for adjudicating disability claims, the ALJ concluded that plaintiff was not disabled within the meaning of the Act. Under step one of the evaluation, the ALJ found that plaintiff "has not engaged in [SGA] since January 1, 2007, the alleged onset date."[36] (Tr. 13.) The ALJ clarified that, although "[t]he claimant reported performing some short-term work between January 2002 and January 2007[,] . . . the claimant's earnings did not reach [SGA]

---

[35] "Your impairment(s), and any related symptoms, such as pain, may cause physical and mental limitations that affect what you can do in a work setting. Your residual functional capacity is the most you can still do despite your limitations." 20 C.F.R. § 416.945(a).

[36] Notably, plaintiff's alleged onset date is January 1, 2002. As will be discussed, *infra*, it is unclear whether the ALJ made a clerical error by citing to January 1, 2007 instead of January 1, 2002, or whether the ALJ determined the onset date to be January 1, 2007 because plaintiff admitted to performing some short-term work for three months ending in January 2007 at the administrative hearing. (Tr. 13, 27.)

levels." (*Id.*) At step two, the ALJ determined that the plaintiff has the following severe impairments: HIV, osteoarthritis in his left shoulder, knee and lower back pain, and macular degeneration of the left eye. (*Id.*) Because these impairments "have more than a minimal impact upon the claimant's ability to engage in work-related activities," the ALJ labeled them as "severe." (*Id.*) However, at step three, the ALJ found that plaintiff does not have an impairment or combination of impairments that is severe enough to meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1525, 404.1526, 416.925, and 416.926). (Tr. 13-14.)

To establish whether plaintiff was capable of performing past relevant work under step four, the ALJ first determined plaintiff's RFC. (Tr. 14-19.) The ALJ found that plaintiff has the RFC "to perform a full range of work at all exertional levels[37] but cannot be exposed to unprotected heights, moving machinery, or perform any work that requires strong visual acuity or depth perception." (Tr. 14.) In reaching this conclusion, the ALJ considered plaintiff's assertions of physical limitations due to pain, blindness, HIV, and Hepatitis C, but did not credit those assertions, as he found them to be contrary to

---

[37]    Exertional level is "a work classification defining the functional requirements of work in terms of the range of the primary strength activities required." SSR 83-10.

the objective medical evidence and other evidence in the record,
including plaintiff's reports of his daily activities.  (Tr. 18.)
In determining plaintiff's credibility, the ALJ referred to
factors listed in 20 C.F.R. §§ 404.1529(c)(3) and 416.929(c)(3),
including "[t]he individual's daily activities." (Tr. 17.)  The
ALJ's decision to discredit plaintiff's assertions was based, in
large part, on the fact that plaintiff admitted certain abilities
that contradict his disability claim.  (Tr. 18.)  For example,
plaintiff "reported attempting push-ups on a daily basis."  (*Id.*)

In determining plaintiff's RFC, the ALJ additionally
considered the professional opinion of plaintiff's treating
physician, Dr. Caesar, but declined to give it controlling
weight, finding that "the internal inconsistencies within and
between the two available reports [provided by Dr. Caesar]
combined with the lack of treatment records and diagnostic
imaging undermine[d] Dr. [Caesar]'s opinion." (Tr. 16-17.)  He
stated that he took Dr. Caesar's opinion "into consideration, in
so far as it was supported by other medical evidence on the
record, as well as the [plaintiff's] reports and testimony."
(Tr. 18.)  The ALJ did not, however, make a determination as to
how much weight Dr. Caesar's opinion deserved.

The ALJ also considered the opinions of Dr. Sheikh and
Dr. Berg, both of whom concluded that plaintiff only had mild
limitations due to his left-eye impairment and was otherwise

fully capable of engaging in physical activities in a
professional setting. (Tr. 15-16.) There is no mention of the
opinion of Dr. Shteyngart, whose RFC assessment is included in
the record and indicates that plaintiff has exertional and
postural limitations. (Tr. 268-73.) Although the ALJ discussed
Project Samaritan's records in his findings, he failed to take
these opinions into account when making his RFC determination.
(*See* Tr. 14-18, 156-83.)

      As a result of his RFC analysis, the ALJ first
concluded plaintiff was "capable of performing past relevant work
as a construction laborer, who performed roofing, painting[,] and
dry-wall hanging tasks, . . . positions [which] spanned from
medium strength to very heavy strength, and were unskilled
positions[38]; an adult care[taker], a light strength, unskilled
position and as a cook helper, a medium strength unskilled
position." (Tr. 18.) The ALJ then found that "the positions of
caretaker and cook's helper do not require the performance of
work-related activities precluded by the claimant's [RFC]."[39]
(*Id.*)

---

[38]      "Unskilled work is work which needs little or no judgment to do simple
duties that can be learned on the job in a short period of time." SSR 83-10.

[39]      As will be discussed, *infra*, the court cannot determine from the opinion
whether the ALJ found that plaintiff's current RFC precludes plaintiff's
performance of his past relevant work as a construction worker. In one
sentence, the ALJ clearly states that plaintiff is capable of performing his
past relevant work as a construction worker; in the next sentence, the ALJ
states that plaintiff's positions as an caretaker and a cook's helper fall
within plaintiff's current RFC. In its motion, the Commissioner interprets
the ALJ's finding to mean that only the caretaker and cook's helper positions

Because the ALJ determined that plaintiff was able to perform past relevant work, he properly did not move on to step five. (Tr. 18.) He ruled that plaintiff was not disabled under the Act, and denied his claims. (Tr. 19.)

## C. Analysis

1. *Onset Date*

First, the court finds that the ALJ either made a clerical error when citing January 1, 2007 as the alleged onset date or failed to provide a cogent explanation for the selection of this date. The onset date is "the first day an individual is disabled as defined in the Act and the regulations." SSR 83-20. In setting the onset date, the ALJ should consider "the applicant's allegations, work history, if any, and the medical and other evidence concerning impairment severity." *Manago v. Barnhart*, 321 F. Supp. 2d 559, 567 (E.D.N.Y. 2004) (quoting SSR 83-20) (internal quotation marks omitted). "The onset date should be set on the date when it is most reasonable to conclude from the evidence that the impairment was sufficiently severe to prevent the individual from engaging in SGA (or gainful activity) for a continuous period of at least [twelve] months or result in death." *See McCall v. Astrue*, No. 05-CV-2042, 2008 WL 5378121, at *17 (S.D.N.Y. Dec. 23, 2008) (quoting SSR 83-20) (internal

---

fall within plaintiff's current RFC. (Tr. 12.) At the very least, the ALJ's finding in step four is ambiguous and should be clarified on remand.

quotation marks omitted).  "Substantial work activity" is work
activity that involves doing significant physical or mental
activities.  20 C.F.R. §§ 404.1572(a), 416.972(a).  "Gainful work
activity" is work that is usually done for pay or profit, whether
or not profit is realized.  20 C.F.R. § 416.972(b).

        The starting point in determining a claimant's onset
date of disability is the claimant's alleged date of onset, and
this date must be accepted if it is consistent with all available
evidence.  *See Monette v. Astrue*, 269 Fed. App'x. 109, 112 (2d
Cir. 2008) (citing SSR 83-20); *McCarthy v. Astrue*, No. 07-CV-
0300, 2007 WL 4444976, at *7 (S.D.N.Y. Dec. 18, 2007).  Where the
alleged onset date is not consistent with the available evidence,
further development of the record to reconcile the discrepancy is
appropriate.  *See McCarthy,* 2007 WL 4444976, at *7.  The ALJ must
provide a persuasive explanation behind his chosen onset date, if
it is different from plaintiff's alleged onset date.  *See id.*
("Where the ALJ determines that the date of onset is other than
what the claimant alleges, he has an affirmative obligation to
adduce substantial evidence to support his finding.") (internal
citation and quotation marks omitted); *McCall*, 2008 WL 5378121,
at *17 ("Convincing rationale must be given for the date
selected." (quoting SSR 83-20)) (internal quotation marks
omitted).

        Here, the ALJ concluded that "[t]he claimant has not

engaged in [SGA] since January 1, 2007," reasoning that although "plaintiff performed some short-term work between January 2002 and 2007, . . . [his] earnings did not reach [SGA] levels." (Tr. 13.) However, as noted earlier, plaintiff's alleged onset date is January 1, 2002. Thus, it appears that the citation to January 1, 2007 instead of January 1, 2002 may be a clerical error. Indeed, the ALJ's finding that the short-term work plaintiff engaged in between 2002 and 2007 did not reach SGA levels contradicts a finding that the onset date is January 1, 2007. However, to the extent that the ALJ determined the onset date to be January 1, 2007, on remand, he shall provide a convincing rationale for choosing that date, and indicate what short-term work plaintiff engaged in between 2002 and 2007. *See McCall*, 2008 WL 5378121, at *18 (finding that the ALJ was required to provide an explanation for plaintiff's onset date, even though evidence in the record was sparse; "[m]oreover, to the extent that additional evidence was required, the ALJ – not [plaintiff] – was required to take additional steps to procure it"); *Wong v. Astrue*, No. CV-06-2949, 2010 WL 1268059, at *11 (E.D.N.Y. Mar. 31, 2010) ("The Court also remands this matter to further develop the record in order to determine a convincing rationale for the date of onset of Plaintiff's disability.").

2. *Treating Physician Rule*

     Second, the court finds that the ALJ failed to consider

the entirety of the administrative record when declining to give
Dr. Caesar's opinion controlling weight, and, thereafter, failed
to specify how much weight he assigned to Dr. Caesar's opinion or
to provide reasons for the undefined weight afforded to his
opinion.

    a.    Failure to Give Controlling Weight to Dr. Caesar's
          Opinion

Here, the ALJ declined to afford controlling weight to
plaintiff's treating physician, Dr. Caesar, because the ALJ found
that "the internal inconsistencies within and between [Dr.
Caesar's] two available reports combined with the lack of
treatment records and diagnostic imaging undermine[d] [Dr.
Caesar's] opinion."  (Tr. 16-17.)

Under the Commissioner's regulations, the medical
opinion of a treating source "on the issue(s) of the nature and
severity of [the] impairment" will be given controlling weight if
such opinion "is well-supported by medically acceptable clinical
and laboratory diagnostic techniques[40] and is not inconsistent
with the other substantial evidence in [the] record."  20 C.F.R.
§§ 404.1527(d)(2), 416.927(d)(2); *see Burgess*, 537 F.3d at 128
(citing *Green-Younger*, 335 F.3d at 106).  According to the
regulations, the opinions of treating physicians deserve

---

[40]    Medically acceptable clinical and laboratory diagnostic techniques
include consideration of a "patient's report of complaints, or history, [a]s
an essential diagnostic tool."  *Green-Younger v. Barnhart*, 335 F.3d 99, 107
(2d Cir. 2003).

32

considerable weight because "these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical evidence alone or from reports of individual examinations." 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). Because of this deferential standard, if an ALJ believes that a treating physician's opinion lacks support or is internally inconsistent, he may not discredit the opinion on this basis but must affirmatively seek out clarifying information from the doctor. *See Clark v. Comm'r of Social Sec.*, 143 F.3d 115, 118 (2d Cir. 1998) (finding that an ALJ's obligation to develop the record in a hearing exists independently from the claimant's obligation to present evidence on his or her own behalf).

Even if an ALJ properly declines to give a treating physician's opinion controlling weight, he must nonetheless adequately explain his reasons for doing so. *See Schaal v. Apfel*, 134 F.3d 496, 505 (2d Cir. 1998); *Regan v. Astrue*, No. 09-CV-2777, 2010 WL 1459194, at *12 (E.D.N.Y. Apr. 12, 2010). Indeed, the Second Circuit has held that although the ALJ has the authority to decline to assign controlling weight to a doctor's finding of disability, "it does not exempt administrative decisionmakers from their obligation, under [*Schaal*] and

33

§ 404.1527(d)(2), to explain why a treating physician's opinions are not being credited." *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999) (citing *Schaal*, 134 F.3d at 505).

First, in determining that Dr. Caesar's opinion should not be given controlling weight, the ALJ relied on the fact that the record did not contain supporting treatment records or diagnostic imaging for his opinion. (*See* Tr. 17.) The record only contains two forms from Dr. Caesar: a "Medical Source of Ability to Do Work Related Activities," dated April 24, 2009, and a "Medical Request for Home Care," dated February 6, 2009. (*See* Tr. 275-278, 279-85.) As the ALJ points out, neither of these forms were accompanied by any supporting treatment records. (*Id.*)

During the administrative hearing, plaintiff's attorney indicated that he had written to Dr. Caesar for records and the ALJ indicated that he would request a report from Dr. Caesar. (Tr. 31-34.) However, in his decision, the ALJ does not address whether he actually requested these treatment records from Dr. Caesar and, if such a request was made, what response he received from Dr. Caesar. This information is necessary to determine whether the ALJ discharged his duty to affirmatively seek out clarifying information where, as here, the record is void of treatment records supporting the treating physician's opinion. *See, e.g.*, *Clark*, 143 F.3d at 118 ("[A treating physician's]

failure to include [proper] support for the findings in his
report does not mean that such support does not exist; he might
not have provided this information in the report because he did
not know that the ALJ would consider it critical to the
disposition of this case."); *Hilsdorf v. Comm'r of Soc. Sec.*, No.
08-CV-S290, 2010 WL 2836374, at *12 (E.D.N.Y. July 15, 2010)
(holding, in part, that the ALJ did not discharge his affirmative
obligation to obtain records from plaintiff's treating physician,
despite his repeated requests for such information).  Thus, on
remand, the ALJ should indicate whether the absence of these
records is due to their non-existence or due to the fact that
they were never requested by either plaintiff's attorney or by
the ALJ himself.  If the ALJ did not already request treatment
records from Dr. Caesar, he shall do so promptly.

Second, the ALJ found that Dr. Caesar's opinion should
not be given controlling weight because he found that "the
internal inconsistencies within and between" the two reports that
Dr. Caesar authored undermined his opinion.  (Tr. 16; *see* Tr.
17.)  Specifically, the ALJ found that Dr. Caesar's request for
home care for plaintiff was inconsistent with other statements
contained in the "Medical Request for Home Care," which the ALJ
concluded "essentially stated that the claimant was self-
sufficient and required no assistance."[41]  (Tr. 16.)  The ALJ

---

[41]     For example, Dr. Caesar opined that plaintiff was able to self-

also found the request for homecare inconsistent with Dr. Caesar's conclusions in the "Medical Source of Ability to Do Work Related Activities," which he found established plaintiff's self-sufficiency and "capability to physically perform light work[42] with some limitations" that were not serious enough "to erode the light or sedentary occupational bases." (Tr. 16.)

In light of the ALJ's affirmative duty to develop the administrative record, an ALJ "cannot reject a treating physician's diagnosis without first attempting to fill any clear gaps in the administrative record." *Rosa*, 168 F.3d at 79; *Hartnett v. Apfel*, 21 F. Supp. 2d 217, 221 (E.D.N.Y. 1998) ("[I]f an ALJ perceives inconsistencies in a treating physician's reports, the ALJ bears an affirmative duty to seek out more information from the treating physician and to develop the administrative record accordingly."). Therefore, on remand, the ALJ should indicate his attempts to seek out more information to clarify the inconsistencies that he found in Dr. Caesar's opinion before declining to afford it controlling weight. *See Clark*, 143 F.3d at 118 (finding that the ALJ should have affirmatively sought out clarifying information concerning the perceived

---

administer his AIDS medications and needed no assistance to ambulate inside or outside, get up from a seated position, or get up from bed. (Tr. 275-77.)

[42]    Light work is defined as "lifting no more than [twenty] pounds at a time with frequent lifting or carrying of objects weighing up to [ten] pounds. Even though the weight lifted in a particular light job may be very little, a job is in this category when it requires a good deal of walking or standing." SSR 83-10.

inconsistencies between a treating physician's two reports
because the treating physician "might have been able to provide a
medical explanation . . . [and/or] offer clinical findings in
support of his conclusion")

Notably, in declining to afford controlling weight to
Dr. Caesar, the ALJ considered Dr. Caesar's opinion in comparison
to Dr. Caesar's own reports and in comparison to the opinions of
Dr. Sheikh and Dr. Berg. (Tr. 15-17.) However, in his analysis,
the ALJ did not consider Dr. Shteyngart's RFC assessment, which
suggests some exertional and postural limitations that support
Dr. Caesar's opinion. (*See* Tr. 269-270, 279-84.) The ALJ also
failed to discuss whether the treatment reports from Project
Samaritan, where plaintiff received primary care for almost one
year, support or undermine Dr. Caesar's opinion. (*See* Tr. 7-19,
156-83.) On remand, the ALJ should consider the totality of the
record, including the records of Dr. Shteyngart[43] and of Project
Samaritan, when determining whether or not Dr. Caesar's opinion
should be assigned controlling weight. *See Hilsdorf*, 2010 WL
2836374, at *11 (remanding case, in part, because a doctor in the
record was "nowhere even mentioned in the ALJ's decision").

---

[43]     A decision to credit Dr. Shteyngart's opinion may impact the ALJ's
determination that plaintiff has the RFC to perform a full range of work at
all exertional levels.  Accordingly, on remand, the ALJ shall also determine
whether there are treatment records supporting Dr. Shteyngart's RFC
determination and what weight should be accorded to his opinion.

b.   Failure to Determine the Weight Given to Dr.
     Caesar's Opinion

In addition, the court finds that the ALJ failed to
explain the weight assigned to Dr. Caesar's opinion and failed to
set forth good reasons for this undetermined weight.  Where an
ALJ determines that a treating physician's opinion should not be
assigned controlling weight, he must, nonetheless, explain what
weight should be afforded to the opinion.  *See Caserto v.
Barnhart*, 309 F. Supp. 2d 435, 444 (E.D.N.Y. 2004) (finding that
remand was warranted by ALJ's failure, *inter alia*, to state what
weight he accorded to opinions of treating physicians).

The regulations provide six enumerated factors to guide
the ALJ's determination: (1) the length of the treatment
relationship and the frequency of examination; (2) the nature and
extent of the treating relationship; (3) the supportability of
the treating source opinion; (4) the consistency of the opinion
with the rest of the record; (5) the specialization of the
treating physician; and (6) any other relevant factors.  20
C.F.R. §§ 404.1527(d)(2)-(6), 416.927(d)(2)-(6);[44] *see Santiago*

---

[44]     The regulations do not *explicitly* require the ALJ to consider these five
factors when determining the weight afforded to a treating physician's opinion
on disability or employability.  *See* 20 C.F.R. §§ 404.1527(d), 404.1527(e)
(explicitly requiring consideration of the factors only when evaluating a
treating source's medical opinion on issues not reserved to the Commissioner).
However, the Second Circuit in *Snell* made clear that the ALJ's obligation to
give adequate reasons for the weight afforded to treating physicians'
opinions, even on issues of disability and employability, arises out of 20
C.F.R. § 404.1527(d)(2).  *See Snell*, 177 F.3d at 133.  Accordingly, the court
adopts the factors articulated in 20 C.F.R. § 404.1527(d)(2) as guidance in
evaluating whether or not the ALJ gave adequate reasons in determining the
weight given to Dr. Caesar's opinion on plaintiff's disability.  *See id.*

38

*v. Barnhart*, 441 F. Supp. 2d 620, 627 (S.D.N.Y. 2006) ("[T]he proper weight given to a treating physician's opinion depends upon [these six factors]. If the ALJ does not articulate 'good reasons' for the weight it accords to a treating physician's opinion, then it is proper for the [c]ourt to remand for a comprehensive explanation of the ALJ's reasoning.").

Here, although the ALJ acknowledged the existence of a "long-term treatment relationship" between plaintiff and Dr. Caesar (Tr. 16), he declined to mention anything about the frequency of examination or, under the second factor, the nature or extent of the treatment relationship between plaintiff and Dr. Caesar. *See* 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). As noted above, while the record provided scant information about their treatment relationship, it was the ALJ's obligation to find and incorporate this information into the record and his decision. On remand, the ALJ should explain the extent to which he has been provided with this information.

Under the third and fourth factors, the supportability of the treating source opinion, and the consistency of the opinion with the rest of the record, respectively, the ALJ did not mention, nor consider, Dr. Shteyngart's physical RFC assessment, along with the opinions of Dr. Sheikh and Dr. Berg, as compared to Dr. Caesar's opinion. (Tr. 15-17.) Dr. Shteyngart's assessment indicates limitations that appear to

support Dr. Caesar's opinion, which suggests that sufficient consideration of this factor may have modified the ALJ's determination. (*See* Tr. 269-70, 279-84.) As previously noted, the ALJ also did not discuss whether or not opinions from Project Samaritan reports were consistent with Dr. Caesar's opinion. (*See* Tr. 7-19, 156-83.) On remand, the ALJ should consider the totality of the record, including the opinions of Dr. Shteyngart and Project Samaritan, when determining how much weight Dr. Caesar's opinion should be afforded.

While the record makes no indication that Dr. Caesar has a specialization, the ALJ should also inquire into this matter on remand, in accordance with the fifth factor. Finally, under the sixth factor, the ALJ did not consider other potentially relevant factors that could have affected the determination of weight given to Dr. Caesar's opinion. (*See* Tr. 16-17.) For example, the ALJ could have but did not discuss Dr. Caesar's level "of understanding of [the SSA's] disability programs and their evidentiary requirements . . . and the extent to which [Dr. Caesar was] familiar with other information in [plaintiff's] case record." *See* 20 C.F.R. §§ 404.1527(d)(6), 416.927(d)(6).

Because the ALJ failed to state what weight he accorded to Dr. Caesar's opinion and to consider the totality of the record and the aforementioned guiding factors when determining

40

the weight given to Dr. Caesar's opinion, the ALJ did not "comprehensively set forth his [good] reasons for the weight assigned to [Dr. Caesar's] opinion." *See Halloran*, 362 F.3d at 33. Accordingly, this case must be remanded to the ALJ for compliance with this requirement. If, after any new evidence is compiled, the ALJ considers the totality of the record and still determines that Dr. Caesar's opinion should not be afforded controlling weight, the ALJ should analyze each of these factors and specify how much weight the opinion should be given. *See Snell*, 177 F.3d at 133 ("Failure to provide 'good reasons' for not crediting the opinion of a claimant's treating physician is a ground for remand." (citing *Schaal*, 134 F.3d at 505)); *Pratts*, 94 F.3d at 39 ("Remand is particularly appropriate where, as here, we are unable to fathom the ALJ's rationale in relation to the evidence in the record without further findings or clearer explanation for the decision.") (internal citation and quotation marks omitted); *Burgess*, 537 F.3d at 130 (remanding case because the ALJ "did not provide the overwhelming compelling type of critique that would permit the Commissioner to overcome an otherwise valid medical opinion" (quoting *Shaw v. Chater,* 221 F.3d 126, 135 (2d Cir. 2000)) (internal quotation marks omitted)).

3. *The ALJ's Step Four Determination*

The court finds the ALJ's step four determination to be

ambiguous and accordingly remands for clarification as to whether the ALJ intended to find that plaintiff's RFC precludes performance of his past relevant work as a construction worker, whether plaintiff's work as a caretaker should be considered past relevant work, and whether plaintiff is able to perform his past relevant work as a cook's helper, given all of the evidence in the record.

Under the fourth step, "the ALJ determines whether the claimant has the RFC to perform previous work [plaintiff] performed." *See Valentin v. Barnhart*, 339 F. Supp. 2d 596, 599 (S.D.N.Y. 2004). Plaintiff's "past work experience, especially part-time work, is not 'relevant' unless, *inter alia*, it was [SGA]." *Melville v. Apfel*, 198 F.3d 45, 53-54 (2d Cir. 1999); *see Wiggins v. Barnhart*, No. 01-CV-4285, 2002 WL 1941467, at *8 (S.D.N.Y. Aug. 21, 2002) ("The Regulations define relevant work experience to mean skills and abilities that the claimant developed within the last [fifteen] years and which constituted [SGA]." (citing 20 C.F.R. § 416.965(a))). SGA "is defined as work involving significant and productive physical or mental duties" that is "done . . . for pay or profit." *Wiggins*, 2002 WL 1941467, at *8 (quoting 20 C.F.R. § 416.910) (internal quotation marks omitted). To assess whether plaintiff's past work was SGA, the ALJ must evaluate "how well the claimant performed [his] duties, whether those duties were minimal and made little or no

demand on [him], what [his] work was worth to the employer, and whether [his] income was tied to [his] productivity." *Melville*, 198 F.3d at 54 (citing 20 C.F.R. § 416.974(a)).

Here, the ALJ first determined that plaintiff is "capable" of performing past relevant work as a construction laborer, a caretaker, and a cook's helper. (Tr. 18.) However, in the next sentence, the ALJ appears to narrow this finding, stating that "the positions of caretaker and cook['s] helper do not require the performance of work-related activities precluded by" plaintiff's RFC (*id.*); this implies that construction work may be precluded by the ALJ's assessment of plaintiff's RFC.[45] As a result, the court is unable to determine whether the ALJ intended to find that plaintiff's RFC allows him to perform all three of his past relevant jobs, or only his jobs as a caretaker and a cook's helper. On remand, the ALJ must clarify this finding for the court.

To the extent that the ALJ intended to conclude that plaintiff's past relevant work as a construction laborer was not precluded by his current RFC, the court notes that this finding appears to be contradicted by both the ALJ's RFC determination and by substantial evidence in the record. (*See* Tr. 14, 145-46, 269-70, 279-83.) Specifically, the ALJ found that, although the

---

[45]    In fact, the Commissioner interprets the ALJ's step four determination to mean that only the caretaker and cook's helper positions fall within plaintiff's current RFC. (Doc. No. 8, Ans.; Doc. No. 10, Mot. for J. on the

plaintiff could perform a "full range of work at all exertional levels," the plaintiff could not "be exposed to unprotected heights, moving machinery[,] or perform any work that requires strong visual acuity or depth perception." (Tr. 14.) Because the construction work that plaintiff reported performing involved the very tasks that the ALJ states plaintiff does not have the RFC to perform, such as hauling a "5[-]gallon bucket of tar on the roof [by climbing] up [a] ladder," using "a nail gun and drill and saw and etc.," and "lifting sheet rock and lifting doors" (*see* Tr. 145-46), a finding that plaintiff could perform this work would seem to contradict the ALJ's RFC determination.[46] (*See* Tr. 145-46.) Further, the opinions of Dr. Shteyngart and Dr. Caesar that plaintiff cannot stand or walk uninterrupted for an entire eight-hour work day and cannot lift over twenty pounds occasionally and ten pounds frequently contradict a finding that plaintiff can work as a construction laborer. (*See* Tr. 269, Tr. 279-80.) *See Mardukhayev v. Comm'r of Soc. Sec.,* No. 01-CV-1324, 2002 WL 603041, at *5 (E.D.N.Y. Mar. 29, 2002) (finding that the ALJ's holding that plaintiff "retained the [RFC] to perform his past work was not supported by substantial evidence.").

---

Pleadings ("Mot.") at 1.)

[46]     Notably, the only evidence in the record of the duties involved in plaintiff's past positions as a construction worker, cook's helper, and caretaker is plaintiff's responses to questions related to these positions in his Work History Report. (*See* Tr. 7-19, 143-47.) On remand, the ALJ should make further inquiry into the tasks involved in each of plaintiff's past positions in order to determine whether, given his RFC, he is able to perform these jobs.

Further, the ALJ shall revisit his determination that plaintiff's work as an elderly caretaker is considered past relevant work, in light of his earlier determination that this position did not rise to SGA levels. Specifically, the ALJ found at step one that plaintiff's earnings from the short-term work that he engaged in between 2002 and 2007 "did not reach [SGA] levels." (Tr. 13.) As the record reflects that the only work plaintiff engaged in after 2002 was his position as a caretaker (Tr. 143), it appears that the ALJ did not believe this position qualified as SGA; however, the ALJ classifies it as past relevant work in step four. (Tr. 18.) The ALJ shall clarify this determination on remand. *See Sarchese v. Barnhart*, No. 01-CV-2172, 2002 WL 1732802, at *9-10 (E.D.N.Y. July 19, 2002) ("I cannot conclude that there is substantial evidence supporting the ALJ's implicit conclusion that both of [plaintiff's] past jobs constituted past relevant work because there is nothing in the ALJ's opinion indicating that he even considered this question. . . . The ALJ had a duty to develop the record on these questions and analyze them. The fact that he did not constitutes legal error." (citing *Melville*, 198 F.3d at 54)).

Finally, on remand, the ALJ shall revisit his determination that plaintiff is able to perform his past relevant work as a cook's helper, in light of all of the evidence in the record. The assessments of Dr. Shteyngart and Dr. Caesar appear

to preclude this position from plaintiff's current RFC. (*See* Tr. 143-46, 269, 279-80.)  For example, according to plaintiff's Work History Report, plaintiff's job as a cook's helper involved walking or standing for seven hours of an eight-hour workday, occasionally lifting up to fifty pounds and frequently lifting up to twenty-five pounds.  (Tr. 143-47.)  However, Dr. Shteyngart's report states that plaintiff can only walk or stand for six hours in an eight-hour work day and lift twenty pounds occasionally and ten pounds frequently (Tr. 269), and Dr. Caesar's report states that plaintiff can only walk or stand for three hours in an eight-hour work day and lift the same amount of weight at the same frequency.  (Tr. 279-80.)  Thus, on remand, the ALJ should reconcile the opinions of Dr. Shteyngart and Dr. Caesar and the plaintiff's description of his past position as a cook's helper with plaintiff's RFC determination so that it properly follows from substantial evidence in the record.  *See Mardukhayev*, 2002 WL 603041, at *5 ("There are several important functions relevant to the claimant's past work that the ALJ did not discuss.").

## CONCLUSION

For the foregoing reasons, the court denies defendant's motion for judgment on the pleadings and remands this case for further proceedings consistent with this opinion; specifically, the ALJ should:

(1)  Clarify whether he intended to select January 1, 2002

or January 1, 2007 as the onset date, and, if January 1, 2007 is the intended onset date, provide a convincing rationale for choosing this date;

(2) Indicate whether he requested supporting treatment records from Dr. Caesar, indicate what response, if any, he received and promptly request these documents from Dr. Caesar, if he has not already done so;

(3) Seek clarification from Dr. Caesar to reconcile the inconsistencies between Dr. Caesar's two available reports;

(4) Consider Dr. Caesar's opinion in light of other evidence in the record that was not expressly considered in plaintiff's disability determination, including assessments from Dr. Shteyngart and Project Samaritan, to determine whether Dr. Caesar's opinion should be afforded controlling weight;

(5) If he declines to assign Dr. Caesar's opinion controlling weight, provide a clear and explicit statement of what affirmative weight, if any, he affords Dr. Caesar's opinion and provide a clear and explicit statement of the "good reasons" for the weight given to Dr. Caesar's opinion in accordance with the guiding factors listed in 20 C.F.R. §§ 404.1527(d)(2)-(6) and 416.927(d)(2)-(6);

(6) Determine whether plaintiff's current RFC precludes him
from performing his past relevant work as a
construction worker and as a cook's helper;

(7) Clarify whether plaintiff's work as a caretaker
qualifies as SGA and, therefore, may be considered past
relevant work under step four of the analysis of
plaintiff's disability claim;

(8) Develop the record as to whether there are treatment
records supporting Dr. Shteyngart's RFC determination,
whether Dr. Shteynhart was one of plaintiff's treating
or consulting physicians, and what weight should be
accorded to Dr. Shteyngart's opinion; and

(9) Reconcile his RFC determination with the opinions of
Dr. Shteyngart and Dr. Caesar and with plaintiff's
descriptions of his past positions, so that the RFC
determination properly follows from a consideration of
all evidence in the record.

Given the passage of time between the ALJ's initial
determination and the instant disposition, the court also
recommends that the ALJ:

(10) Inquire upon plaintiff's current medical condition as
it relates to plaintiff's initial SSI application; and

(11) Reassess plaintiff's testimonial credibility,
subjective complaints of pain and functional

limitations, employability, and disability in light of
this opinion, in light of plaintiff's current medical
condition, and in light of any newly obtained
information relevant to plaintiff's claims. *See Lisa
v. Sec'y of the Dep't of Health & Human Servs.*, 940
F.2d 40, 44 (2d Cir. 1991) (holding that assessments of
plaintiff's medical condition, after the ALJ's initial
disability determination, may reveal that plaintiff has
"an impairment substantially more severe than was
previously diagnosed").

The Clerk of the Court is respectfully requested to
serve a copy of this Memorandum and Order on the plaintiff and to
close the case.

**SO ORDERED.**

Dated:    August 6, 2010
          Brooklyn, New York

                                    _____ /s/_____
                                    Kiyo A. Matsumoto
                                    United States District Judge